**F I L E D**

**PUBLISH**

**NOV 9 1998**

**UNITED STATES COURT OF APPEALS**

TENTH CIRCUIT

CITY OF HOBBS,

    Plaintiff-Appellant,

v.

HARTFORD FIRE INSURANCE
COMPANY,

    Defendant,

and

NUTMEG INSURANCE COMPANY,

    Defendant-Appellee.

No. 96-2212

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
(D.C. No. CIV-95-79-PJK/MV)**

---

K. Stephen Royce, Albuquerque, New Mexico (Eric Scott Jeffries of Jeffries & Rugge, P.C., Albuquerque, New Mexico, with him on the brief), for Plaintiff-Appellant.

William P. Gralow of Civerolo, Gralow & Hill, Albuquerque, New Mexico (Jennifer L. Weed with him on the brief), for Defendants-Appellees.

---

Before **PORFILIO, HOLLOWAY,** and **EBEL,** Circuit Judges.

---

**HOLLOWAY,** Circuit Judge.

Plaintiff-Appellant City of Hobbs sued Nutmeg Insurance Company (Nutmeg) in New Mexico state court alleging bad faith, breach of contract, and unfair claims practices in defense of a federal court damage claim brought earlier under 42 U.S.C. § 1983 and a supplemental wrongful death claim against Hobbs and Officer Harrison of the Hobbs police force. Nutmeg removed the state court action for bad faith and related claims to the United States District Court for the District of New Mexico on diversity grounds.

Following discovery, the federal district court granted Nutmeg's motion for summary judgment as to the breach of contract and unfair claims practices claims but ordered the bad faith claim to go to trial. After the close of all of the evidence, the district court granted Nutmeg's motion pursuant to Rule 50 of the Federal Rules of Civil Procedure for judgment as a matter of law on the bad faith cause of action.[1] Hobbs appeals the district court's ruling on the Rule 50 motion and the judgment entered pursuant to that ruling. Hobbs also asserts error below in rejecting opinion testimony by a Hobbs' expert on Nutmeg's handling of the § 1983 and wrongful death claims and its failure to settle the claims and protect Hobbs from

---

[1]Rule 50 provides:

> (a)(1) If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under controlling law be maintained or defeated without a favorable finding on the issue.

Fed. R. Civ. P. 50.

a large verdict rendered in excess of Nutmeg's liability coverage.

# I

## A

### The Civil Rights and Supplemental Claims Litigation

This case has its roots in the tragic shooting death of 21-year-old Jorge Perez. On December 25, 1991, police officers of the City of Hobbs, New Mexico, responded to a report of a domestic disturbance at the home of Mrs. Nieto, Perez' mother-in-law. Upon arriving at the scene, officers Ben Harrison and Jim Bob Hardy encountered Mr. Perez. Mr. Perez held what was later determined to be a "2x4" piece of lumber, some ten feet four inches in length. III App. at 623. Mr. Perez advanced on the officers and yelled obscenities at them. III App. at 734. Officer Harrison aimed his service weapon at Mr. Perez, firing twice and hitting Mr. Perez once in the chest. Mr. Perez died shortly thereafter. He was survived by his 19-year-old wife and three-year-old son.

The City of Hobbs carried liability insurance with Nutmeg that was effective the day of the shooting. I App. Ex. 1. The policy contained a $300,000 limit for claims arising under New Mexico law and a $1,000,000 limit for claims arising under law other than that of New Mexico. Id. at 37. As a condition of the insurance policy, Nutmeg had the right and duty to defend any claim or suit seeking damages covered by the policy and the discretion to investigate any occurrence and settle any claim. Id. City of Hobbs officials immediately notified Nutmeg of the shooting. I App. Ex. 4.

Michael Tompkins (Tompkins), an adjuster for Nutmeg, was assigned to the Perez matter. Tompkins asked a lawyer, R.E. Richards, to defend Officer Harrison and the City against the Perez Estate claim and to lead the investigation. I App. Ex. 9; I App. Ex. 5. Richards in turn relied on the Hobbs Police Department to conduct an investigation. III App. at 777. The police department began investigating the claim, including having a diagram on the incident scene prepared. Mr. Richards also retained an expert witness on civil rights actions under § 1983 for the City, Dr. Parsons, who later made a report saying that Officer Harrison's use of force was according to his training. III App. at 793.

A few days after the shooting Mrs. Perez hired Brad Hall, an Albuquerque attorney who had previously handled excessive force cases. Mr. Hall filed suit on January 23, 1992, on behalf of the Perez Estate and Mr. Perez's young son in the United States District Court for the District of New Mexico against the City of Hobbs, Marshall Newman individually and in his official capacity as Chief of Police, Officer Harrison individually and in his official capacity as a Hobbs police officer, and John Does 1-8, Supervisors and Trainers of Harrison, alleging claims for damages pursuant to 42 U.S.C. § 1983 and damage claims for assault, battery, wrongful death, negligent training, and negligent infliction of emotional distress pursuant to New Mexico law as supplemental jurisdiction claims. I App. Ex. 7. The district court had jurisdiction of the § 1983 claims pursuant to 28 U.S.C. §§ 1331 and 1343(a) and supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a). A first amended complaint filed for the Perez Estate named only Officer Harrison individually and

in his official capacity as a Hobbs police officer. I App. Ex. 18.

This civil rights and supplemental claims litigation later fomented the instant bad faith claim litigation by the City of Hobbs against Nutmeg, its liability insurer. This bad faith controversy arose because of a large liability the City of Hobbs had to bear by payment of some $1,700,000 above its insurance coverage to settle liability on a $3,335,000 judgment recovered by the Perez Estate in the underlying § 1983 and wrongful death case. The bad faith complaint was filed in a New Mexico District Court and was removed to the federal court below on diversity grounds on January 24, 1995. I App. at 1. The instant appeal is from a judgment entered August 2, 1996, for the defendant insurers after the trial judge sustained a Rule 50 motion in the federal bad faith claim trial. The trial below on that claim produced our record that contains considerable evidence on events surrounding the earlier trial in the underlying § 1983 and wrongful death litigation. While we necessarily will be discussing evidence introduced in that underlying § 1983 and wrongful death trial, this is evidence that was admitted at the bad faith trial itself.

We turn now to the bad faith claim trial and to consideration whether the trial judge correctly took the case away from the jury after the bad faith trial evidence was completed.

**B**

**The Bad Faith Trial Record**

The Perez Estate's attorney, Brad Hall, employed Rocky Stone, a scene reconstruction witness, who developed a diagram that contradicted the City of Hobbs police department

measurements. III App. at 640-41; IV App. at 936-37. Mr. Hall testified that Mr. Stone's reconstruction also conflicted with Hobbs' police department accounts, including Officer Harrison's statements. III App. at 625. Officer Harrison presented problems for the City and for Nutmeg. He contradicted himself regarding the Perez shooting. On one occasion, he stated that Perez carried the wood board over his right shoulder. In the next statement he said the board was over Mr. Perez's left shoulder. Moreover, Mr. Hall brought former police officers to the shooting scene and they concluded that Officer Harrison's actions resulted in a "bad shooting." III App. at 626-27.

Internally, some senior staff members at Nutmeg expressed some concerns about the Perez case. Ron Kubas, a senior claims adjuster for ITT Hartford, the parent company of Nutmeg, stated: "Given that there were two officers involved in this investigation, you would think that they should have been able to subdue this individual without requiring the firing of a gun . . . ." I App. Ex. 8, p. 1. Defense counsel expressed his view that "a 'runaway jury' could really tag us, although [he did] not think this will be a 'runaway jury.'" I App. Ex. 26, p. 4. The record indicates that Nutmeg's concerns were passed along to City of Hobbs officials. II App. at 392, 395-96; I App. Ex. 2, p. 73. However, there is evidence that despite weaknesses, Nutmeg's defense counsel Richards and the defense expert witness viewed the Perez Estate claim as defensible. III App. at 793; IV App. at 951; I App. Ex. 20, p. 2; Ex. 21, p. 10.

Prior to trial, defense counsel informed City of Hobbs officials that a comparative

negligence defense would substantially mitigate what damages the city would have to pay if a jury found in favor of the Perez Estate. II App. at 382, 560; I App. Ex. 2, p. 65. Defense counsel made these assertions despite adjuster Tompkins' knowledge that a comparative fault defense was not available for the § 1983 claim. IV App. at 893-96. City officials were not informed until trial that the comparative negligence defense was not applicable to either Perez's § 1983 cause of action or the supplemental wrongful death cause of action. II App. at 438; III App. at 575. Earlier defense counsel and adjuster Tompkins discussed comparative fault and its potential effect of reducing an adverse jury verdict. III App. at 799; IV App. at 893 (discussion among Tompkins and City of Hobbs representatives Gallagher and Thomas).

During preparation for the § 1983 and wrongful death suit, Hall hired an economist, Brian McDonald, to prepare an estimate of economic and money loss caused by Mr. Perez's death. McDonald concluded earnings loss and loss of household services to be approximately $825,000. I App. Ex. 17. Tompkins testified that he saw from the report that McDonald had submitted a government report that OSHA had come up with figures of between $1,000,000 and $4,000,000 for loss of enjoyment of life. III App. 790-91. This injury was referred to as supporting hedonic damages.[2] Exhibit 17 is an August 13, 1992,

---

[2]The term "hedonic" has been defined as "of, pertaining to, or characterized by pleasure." Webster's II New Riverside Univ. Dictionary 572 (1984). Hedonic damages covers the loss of the value of life itself. See Bell v. City of Milwaukee, 746 F.2d 1205, 1236 (7th Cir. 1984).

letter from Hall to Mr. Richards, the attorney for Hobbs, which forwarded the McDonald damages estimate and concluded: "However, I am as always willing to discuss any reasonable resolution of a lawsuit." Id. Defense counsel Richards forwarded Hall's letter and the McDonald report to Nutmeg and the City of Hobbs. I App. Ex. 17.1. Defense counsel dismissed the report as "bullshit," II App. at 402, because Dr. McDonald's conclusions were felt by counsel to be inflated. III App. at 791. Neither Tompkins nor any other agent at Nutmeg conducted an independent appraisal of Perez's lost earnings, household services or hedonic damages. III App. at 791; IV App at 866-67. Risk Manager Thomas of the City of Hobbs testified that there were no discussions by him with Adjuster Tompkins about Dr. McDonald's evaluation of economic damages or the larger damages item for loss of enjoyment of life. III App. at 572-73. Thomas also said he did not discuss the $1,000,000 to $4,000,000 item on hedonic damages in the McDonald report with defense attorney Richards. Id.

Two weeks before the trial in Roswell, New Mexico, Nutmeg offered the Perez family $50,000 to settle the case. III App. at 651. The Nutmeg adjuster Tompkins and Nancy Downing, a Nutmeg claims representative, were concerned that "the police officer was Caucasian and the victim was Hispanic; that it had happened on Christmas day; that the police department is sometimes a target defendant and we need to take a look at those type of things; that a fatality claim is a concern that we should talk about." III App. at 785-86. The Estate's attorney, Hall, rejected the $50,000 offer as unreasonable. III App. at 651. Hall

had informed defense counsel that excessive force cases in Albuquerque tended to settle for between $250,000 and $400,000 but that the Perez case was stronger than usual. III App. at 643, 653. Shortly before trial, on November 20, 1993, Hall sent a letter to defense counsel Richards that stated he would recommend his client accept any offer above $600,000. The letter read:

> As you recall, I told the Court in the Pre-Trial Conference that I could send a demand in this case. My recollection is that you informed me early on after meetings with Judge McCoy that not much money is available, if any, and certainly nothing like the City of Albuquerque pays in police shooting cases ($250,000-$400,000). I believe this case is worth significantly more. The damages testimony will center around three to three point five million. However, <u>I obviously would have to recommend to my client that she accept any offers over $600,000.</u>

II App. Ex. 28.1 (emphasis added). Hall himself referred to the letter as an offer. I App. at 87. Moreover, the addressee, Richards, defense counsel for the City of Hobbs, also referred to the letter as an offer. Richards forwarded Hall's letter of November 20, 1993, to Nutmeg's adjuster Tompkins, saying in part: "I enclose <u>offer of settlement</u> dated November 20, 1993 from Brad Hall." II App. Ex. 28 (emphasis added).

Settlement negotiations did not proceed because Nutmeg valued the Perez Estate claim at less than six figures. III App. at 790. Hobbs officials did not express interest in settling the Perez Estate claim for a substantial amount of money. III App. 785-86, 799-800. The City of Hobbs officials were concerned that a settlement, in light of Nutmeg's assurances that the Perez claim was defensible, would upset the morale of the city police department. Nutmeg based its decision to litigate in part on the City of Hobbs' reluctance to settle. III

App. at 799-800.

A five-day trial of the § 1983 and wrongful death claims commenced on December 13, 1993. The Perez Estate was able to introduce their expert Stone's opinion testimony in making its case. Nutmeg agents themselves felt that Stone testified well at trial. I App. Ex 3, p. 14. On December 17, 1993, the jury returned a verdict in favor of the Perez Estate for $3,335,000. This verdict was within the range that McDonald's report presented for the Estate. IV App. at 973. Richards, defense counsel at the underlying § 1983 and wrongful death trial, testified at the bad faith claim trial that the large verdict for the Perez Estate was a complete surprise to him. IV App. at 952. The parties reached a settlement of the appeal of the case for $2,700,000. II App. Ex. 32. Nutmeg paid the Perez Estate $1,000,000, its full coverage; the City of Hobbs paid the estate $1,700,000.

Following the underlying § 1983 and wrongful death claim trial, the City of Hobbs filed suit on January 24, 1995, in New Mexico state court against Nutmeg for bad faith, breach of contract and unfair trade claims practice. Nutmeg removed the case to the New Mexico federal court on diversity grounds. Nutmeg moved for summary judgment as to all of Hobbs' claims against it. The district court granted Nutmeg summary judgment on the breach of contract and unfair trade claims practice claims but denied summary judgment on the bad faith claim. IV App. at 1068.

Trial began on July 30, 1996 on the bad faith claim. Hobbs called Keith Charleston as an expert in insurance claims handling practice to provide an expert opinion on Nutmeg's

handling of the Perez Estate's claim. Nutmeg objected to Charleston's testimony pursuant to Rule 702 of the Federal Rules of Evidence. The trial judge sustained the objection, concluding that Charleston lacked specific knowledge as to insurance claims handling practice in New Mexico. III App. at 694. An offer of proof of Charleston's testimony was made, which was rejected.

On completion of the City of Hobbs' case, Nutmeg moved for judgment as a matter of law pursuant to Fed. R. Civ. P. 50. III App. at 708. The district court denied that motion. Nutmeg then presented its own case and on resting, renewed its Rule 50 motion. The district court then granted the motion concluding, *inter alia*, that the City of Hobbs failed to show that Nutmeg placed its interests above the interests of the City of Hobbs, IV App. at 1045-46; II App. at 311, and entered judgment for Nutmeg and Hartford. The instant appeal followed.

## II

### The Appeal from Judgment for the Insurers Under Rule 50

### A

### Governing Federal and New Mexico Legal Principles

The City of Hobbs raises two issues on appeal. First, it argues that the district court erred in granting Nutmeg's motion for judgment as a matter of law, taking the case away from the jury, because Hobbs presented sufficient evidence that could reasonably support a jury determination that Nutmeg acted in bad faith by failing to settle with the Perez Estate within the $1,000,000 coverage that the City of Hobbs had, leaving the City exposed to a

-11-

large excess verdict like that which resulted. Second, Hobbs contends that the district court abused its discretion in sustaining Nutmeg's objection to testimony by Hobbs' insurance claims expert Charleston, who was qualified as an expert and who offered an opinion that would have been helpful to the jury.

We review the grant of a motion for judgment as a matter of law *de novo*, see Doan v. Seagate Tech., Inc., 82 F.3d 974, 976 (10th Cir. 1996), applying the same standard as the district court. See also Harold Stores, Inc. v. Dillard Dep't Stores, Inc., 82 F.3d 1533, 1546 (10th Cir. 1996), cert. denied, 117 S. Ct. 297 (1996). In diversity cases, the substantive law of the forum state generally governs our analysis of the underlying claims, but "[t]he appropriateness of a Rule 50 judgment as a matter of law is a federal procedural question." Lyon Dev. Co. v. Business Men's Assurance Co., 76 F.3d 1118, 1121-22 (10th Cir. 1996).

The City of Hobbs contends that the district court erred in granting Nutmeg's motion for judgment as a matter of law because the City offered testimony and documentary evidence that gave rise to inferences sufficient to support a jury verdict in its favor that Nutmeg acted in bad faith in failing to settle with the Perez Estate within the $1,000,000 policy coverage. Judgment as a matter of law is appropriate only where, with all reasonable inferences from the evidence drawn in the nonmovant's favor, a jury verdict for the nonmovant would be improper. Thompson v. State Farm Fire & Cas. Co., 34 F.3d 932, 941 (10th Cir. 1994). If we determine that the record could reasonably support a jury verdict in favor of the City of Hobbs, we must reverse the district court's ruling and judgment.

Before we can decide whether the district court erred in granting Nutmeg's Rule 50 motion, we must first look to the law of the forum state for guidance on the City of Hobbs' substantive claim. Under New Mexico law, an insured has a cause of action against its insurer for bad faith for failing to settle where its insurer breaches an "implied covenant of good faith and fair dealing that the insurer will not injure its policyholder's right to receive the full benefits of the contract." Dairyland Ins. Co. v. Herman, 954 P.2d 56, 60 (N.M. 1997). New Mexico does not adhere to a single definition of bad faith in the context of insurance matters. Ambassador Ins. Co. v. St. Paul Fire & Marine Ins. Co., 690 P.2d 1022, 1025 (N.M. 1984). The key principle underlying the covenant of good faith in an insurance contract is that the insurer treat the interests of the insured equally to its own interests. See Dairyland, 954 P.2d at 61. Thus an insurance company acts in bad faith when it places its own interests ahead of the interests of the insured. Id.; see also N.M. Uniform Jury Instruction 13-1704.[3]

_____

[3]Jury Instruction 13-1704 is entitled "Bad faith failure to settle," and it provides:

> A liability insurance company has a duty to timely investigate and fairly evaluate the claim against its insured, and to accept reasonable settlement offers within policy limits.
> An insurance company's failure to conduct a competent investigation of the claim and to honestly balance its own interests and the interests of the insured in rejecting a settlement offer within policy limits is bad faith. If the company gives equal consideration to its own interests and the interests of the insured and based on honest judgment and adequate information does not settle the claim and proceeds to trial, it has acted in good faith.

The New Mexico Supreme Court has provided in its orders on "Uniform Jury

-13-

The crux of City of Hobbs' complaint is that Nutmeg acted in bad faith by failing to settle with the Perez Estate within the limits of the $1,000,000 coverage. City of Hobbs argues that bad faith is evidenced by Nutmeg's failure to adequately investigate and evaluate the Perez Estate's claim, failure to reasonably consider Hall's discussion of a settlement recommendation at $600,000, or pursue settlement negotiations, and failure to adequately inform City of Hobbs on the prospects of a jury verdict in excess of the $1,000,000 policy limits. The City also claims there was error in rejecting its expert's testimony on insurance claims handling.

Nutmeg responds that the City failed to present "clear and convincing evidence" to support its bad faith claim; that the trial judge found no evidence indicating that "anyone from the insurance side . . . disregarded the interest of the insured in deciding to try the case"; and that there was a lack of evidence that Nutmeg preferred its own interest to that of the City.

Two New Mexico cases and New Mexico Uniform Jury Instruction 13-1704 are instructive. In Dairyland Ins. Co., the New Mexico Supreme Court responded to a question certified to it by our court, which is set out in the footnote below.[4] The New Mexico Court

Instructions - Civil" at vi that the above instruction was approved July 17, 1991. The Court's rules further provide in their preface that "the trial judge shall instruct the jury in the language of the Uniform Jury Instructions . . . ."

[4]The certified question read:

Does an insurer satisfy its duty to treat its interests and the interests of its insured equally, as a matter of law, when it requires a release of all claims,

responded "No" to that question. In discussing the issues, the New Mexico Court said that the plaintiff husband had presented sufficient evidence to defeat a motion for summary judgment against the husband's bad faith counterclaim. Dairyland, 954 P.2d at 65. The Court stated that:

> We conclude that when there is a substantial likelihood of recovery in excess of limits, an insurer's unwarranted refusal to settle is a breach of the implied covenant of good faith and fair dealing.

Dairyland, 954 P.2d at 61. The New Mexico Court further held that under its insurance decisions, conflicting interpretations of the facts on the bad faith issue should be resolved at trial:

> It is possible to interpret the events in this case as Herman would, characterizing Dairyland's conduct as a complete disregard for the interests of its insured. . . . On the other hand, Dairyland's conduct may be interpreted as a good-faith effort to protect its insured. Since the parties urge conflicting interpretations of the facts, the question of whether Dairyland acted in bad faith should be resolved at trial.

Id., 954 P.2d at 65. In Dairyland, the New Mexico Court further noted an insurer's good faith evaluation of costs and benefits of settlement is generally accorded deference, 954 P.2d at 61, adding that "[h]owever, judicial deference lessens whenever there is a substantial likelihood of a recovery that exceeds policy limits." Id.

In Ambassador Ins. Co., 690 P.2d 1022, the New Mexico Court addressed similar

---

including subrogation claims, against its insured as a condition precedent to a policy limits settlement when there is a substantial likelihood of recovery in excess of policy limits?

-15-

questions. It held that there is no cause of action in New Mexico for negligent failure to settle, but there can be liability for bad faith failure to settle. The Court said that such bad faith conduct for failing to settle within policy limits must be of an arbitrary and reprehensive nature, but it approved instructions as a whole that included a charge that

> an insurer cannot be partial to its own interests, but must give its interests and the interests of its insured equal consideration. . . . The failure of an insurance company to fairly balance those interests can constitute bad faith.

690 P.2d at 1025-26 (emphasis added).

The district judge below stated from the bench the reasons why Nutmeg was entitled to judgment as a matter of law. IV App. at 1044-49. In essence, the trial judge stated two grounds for granting the Rule 50 motion. First, under Ambassador Ins. Co., the City of Hobbs could not recover for Nutmeg's negligent failure to settle and that the City had not provided evidence sufficient to show that Nutmeg disregarded the interests of its insured in deciding to try the Perez case. Id. at 1046. Second, the district court emphasized that the case was tried as a bad faith failure to settle claim but that the Perez Estate never made an offer of settlement or an unconditional demand. Id. at 1045, 1047-48. We disagree, being persuaded that the New Mexico courts would not follow the restrictive view that the absence of a firm offer to the insurer forecloses the possibility of a claim of bad faith failure to settle.

In Dairyland, 954 P.2d at 61, the New Mexico Court stated that when a claimant makes a firm reasonable offer to settle within policy limits, the implied duty of good faith and fair dealing may require the insurer to settle. However, Dairyland does not analyze the

insurer's duty in circumstances where a firm offer is not made or set any parameters prohibiting recovery for a bad faith failure to settle in other circumstances where a firm offer to the insurer has <u>not</u> been made. We turn now to cases that do address that situation.

First, our court in <u>Coleman v. Holecek</u>, 542 F.2d 532 (10th Cir. 1976), a Kansas law insurance controversy presented the question whether a liability in excess of coverage should be imposed on the insurer where it had been found in bad faith in failing to defend a suit against its insured. The insurer argued that since the claimant had never made a settlement offer, its liability is limited to that which it faced had it defended the personal injury suit and lost (the policy limits). <u>Id.</u> at 536. We looked to analogous Kansas law involving a bad faith refusal to settle and noted that excess liability of the insurer arises under Kansas cases not only where there is a bad faith refusal to accept a settlement offer made to the insurer by the claimant, but also where the insurer fails to initiate settlement negotiations; the duty to consider the insured's interest arises because of a claim for damages in excess of the policy limits, not because a settlement offer had been made. <u>Id.</u> at 537. Applying these principles, our <u>Coleman</u> opinion held the insurer subject to excess liability above the policy limits because of bad faith by the insurer in withdrawing from defense of the case and from embryonic settlement negotiations, and that the duty to settle did not hinge on the existence of an offer from the plaintiff. <u>Id.</u> at 537. <u>See also</u> <u>Farmers Ins. Exchange v. Schrapp</u>, 567 P.2d 1359, 1366 (Kan. 1977) (noting our <u>Coleman</u> opinion and citing its statement that the duty to settle does not hinge on the existence of a settlement offer from the plaintiff).

-17-

We note that there are numerous jurisdictions which likewise reject limitation of the insurer's duty of good faith in settlement to cases where a settlement offer has been made. See Maine Bonding & Cas. Co. v. Centennial Ins. Co., 693 P.2d 1296, 1299 (Ore. 1985) (under Oregon law, insurer's duty "may require that an insurer make inquiries to determine if settlement is possible within the policy limitations."); Rova Farms Resort, Inc. v. Investors Ins. Co. of America, 323 A.2d 495, 506-07 (N.J. 1974) (insurer, having restricted negotiating power of insured, has positive fiduciary duty to take the initiative and attempt to negotiate a settlement within the policy coverage); State Auto Ins. Co. v. Rowland, 427 S.W.2d 30, 32-34 (Tenn. 1968) ("to hold as a matter of law that an [insurer] cannot be guilty of bad faith unless it received an offer . . . within the policy limits could most certainly lead to inequitable results."); Fulton v. Woodford, 545 P.2d 979, 984 (Ariz. 1976); Alt v. American Family Mut. Ins. Co., 237 N.W.2d 706, 710-11 (Wis. 1976); Hartford Ins. Co. v. Methodist Hospital, 785 F. Supp. 38, 40 (E.D.N.Y. 1992) (New York law).  But see Commercial Union Ins. Co. v. Mission Ins. Co., 835 F.2d 587, 588 (5th Cir. 1988) (Louisiana law); Seward v. State Farm Mut. Auto. Ins. Co., 392 F.2d 723, 727-28 (5th Cir. 1968) (applying Florida law but questioning the logic of Florida's rule); Ranger Ins. Co. v. Home Indem. Co., 741 F. Supp. 716, 718 (N.D. Ill. 1990) (Illinois law); American Physicians Ins. Exchange v. Garcia, 876 S.W.2d 842, 850 n.17-18 (Tex. 1994).

Good faith in New Mexico imposes "upon the insurer the duty to settle whenever practicable." Dairyland, 954 P.2d at 61.  We believe that New Mexico would not limit this

duty to cases only where the claimant made a firm offer; instead, we are persuaded that New Mexico would follow the several decisions cited above to hold that an insurer can be liable for a bad faith failure to settle even though a claimant has not submitted a firm reasonable offer.

New Mexico follows the rule that an insurer who fails to settle in bad faith is liable for the entire judgment against the insured, including the amount in excess of policy limits. Dairyland, 954 P.2d at 61; Lujan v. Gonzales , 501 P.2d 673, 684 (N.M. 1972); see also Highlands Ins. Co., 64 F.3d at 517 (applying California law, "[a]n insurer who violates the covenant of good faith is liable for the entire judgment."). To use any other measure of damages would allow insurers to "profit from their own wrongs," Dairyland, 954 P.2d at 61, an inequity the New Mexico courts do not allow. Id.

We reviewed earlier the basic proof bearing on the bad faith claim, but we note below particular evidence convincing us that there was a submissible case for the jury.

**B**

**The Factual Support for the City of Hobbs' Bad Faith Claim**

The record shows that the Perez Estate's claim presented a serious risk of a substantial verdict against the insured. Adjuster Mike Tompkins on February 12, 1991, stated to trial counsel Richards his opinion that liability was a "very tough call, clmt [claimant] was killed by officer on insd [insured] force during a domestic dispute." I App. Ex. 9. Tompkins stated in a "Trial Alert" document on December 3, 1993, that special damages were sought for

-19-

"meds, lost wages, loss of consortium, violation of civil rights" and that as to "Exposure to Verdict" on a 1-10 scale, with one as high, Tompkins rated the risk as "5 perhaps we have a strong technical case but this is a jury emotion exposure & coming to trial at Christmas." Tompkins added, however, that defense counsel "feels we have strong case." II App. Ex. 29.

Among the unfavorable emotional factors facing the defense was the Christmas Day 1991 shooting death of Perez who was armed only with a 2x4 piece of lumber approximately ten feet long. The insurer's activity log noted on February 20, 1992. that "the initial Fax was in error in stating 2x8x8 . . . appears to be a mute [sic] point, either board is awkward, and fact remains officer could have shot clmt. in arm, leg, or whatever." II App. Ex. 2, p. 86. Perez was shot in the chest. I App. Ex. 12, p. 2. The log recorded a comment that "This is difficult case and will not be resolved easily." II App. Ex. 2, p. 86.

Other difficulties for the defense are apparent from the record. Officer Hardy, who accompanied Officer Harrison, had an account that conflicted with Harrison. On December 25, 1991 (the day of the shooting), Harrison stated that "Perez raised the board up and advanced 'in a fast motion' 'Had it over his head like he was gonna hit me.'" "I felt he was gonna hit me over the head with it." II App. Ex. 25.2. Hardy said on December 26: "He sees Perez carrying a 2x4 like he's jousting, running south." ". . . . most of the stick in front of him" "flat out in front of him." Id. at 2. Exhibit 25.2 is the notes of Mr. Stone (who testified for the Perez Estate) and they were admitted at the bad faith trial. Mr. Stone's conclusions therein stated in part: "Given the overhanging trees along the east side of the

garage, the narrowness of the walkway between the garage and the house, the overhang of the garage and house roofs, and the wires overhanging that walkway, I don't feel that Perez could possibly have swung the 2x4 like baseball bat and struck Harrison while either of them were still in the walkway." Id. at 2.

In addition, Nutmeg was on notice that damages here could be very large. It received a copy of Dr. McDonald's report from plaintiff's counsel which analyzed the substantial elements of damages that the Perez Estate might recover. This report was sent to the attorney for the City, Mr. Richards, see I App. Ex. 17, by the Estate's attorney, Mr. Hall. The McDonald report details a lost earning capacity of $527,826 through a work life of 33 years, after federal and state income taxes, social security contributions and personal maintenance. Dr. McDonald also calculated some $297,570 in household services rendered by the average 21-year-old male through a life expectancy of age 73. Furthermore, McDonald estimated "hedonic damages or the value of life itself." This report was acknowledged by Adjuster Tompkins to have been received by him, and he referred to it and the details therein from a government OSHA report with figures between $1,000,000 and $4,000,000 for loss of the enjoyment of life. III App. at 790-91. Tompkins admitted on cross-examination that the defense had no expert witnesses to challenge the $527,826 loss of earnings item in the McDonald report, or the $297,570 item for lost household services. IV App. 866-67. We have alluded earlier to Nutmeg's recognition that the Perez Estate claim was emotionally dangerous and this is a factor which must be taken into account. See Magnum Foods, Inc.

v. Continental Cas. Co., 36 F.3d 1491, 1508 (10th Cir. 1994) (applying Oklahoma law) (noting probable jury sympathy for the victim which strengthened a case against an insured). The insurer was on notice of the risk of a verdict well over the $1,000,000 coverage.

The insurer did not make serious efforts to settle the case or engage in settlement discussions. In May 1992, Hall discussed the possibility of settling the case for an amount within the Albuquerque Police Department (APD) range of $250,000 to $400,000. III App. at 643, 645-46. Defense counsel responded that Hobbs "won't pay what Albuquerque pays," which ended the discussion. III App. at 643. On August 13, 1992, Hall submitted to Richards a letter containing McDonald's report and stated in the letter that he was "willing to discuss any reasonable resolution of a lawsuit." I App. Ex. 17. The defense made no response to Hall's suggestion to negotiate a settlement until the offer by the City to settle for $50,000, submitted some two weeks before the trial began in December 1993, III App. at 644, which was rejected by plaintiff's attorney as unreasonable. III App. at 651. And as noted, plaintiff's attorney Hall had advised the City's attorney Richards that he "obviously would have to recommend to my client that she accept any offers over $600,000.00." II App. Ex. 28.1, and this was forwarded to Tompkins with a cover letter by the City's attorney Richards, stating that he "enclose[d] offer of settlement dated November 20, 1993 from Brad Hall." II App. Ex. 28.

This evidence could reasonably support an inference of bad faith by the insurer in light of the risk of a substantial verdict above the insurance coverage of the City of Hobbs.

-22-

In <u>Dairyland</u>, 954 P.2d at 61, the New Mexico Supreme Court held that "when there is a substantial likelihood of recovery in excess of limits, an insurer's unwarranted refusal to settle is a breach of the implied covenant of good faith and fair dealing." During Mr. Hall's testimony at the bad faith trial, he was asked whether he recalled any conversations with Richards, the City's defense attorney, on the possibility of settlement. Hall recalled vaguely that he had mentioned the Albuquerque Police Department range; that this range was from $300,000 to $400,000; and that this was not an offer, but was "an opening the door to a possible conversation." Richards did not open the door any further, and there is no other real discussion of settlement in our record beyond the $50,000 earlier offer by the insurer, and the $600,000 comment in Mr. Hall's letter. And as discussed above, we feel that New Mexico would hold that a cause of action for bad faith failure to settle can exist in the absence of a firm offer in accord with the several cases adopting that view.

In sum, in light of the circumstances before it, the jury could reasonably have determined that the insurer acted in bad faith, placing its interests above those of its insured. Thus it was error to sustain the motion for judgment as a matter of law, taking the bad faith case away from the jury.

**C**

**The Claim of Error in the Exclusion of Testimony by the
City of Hobbs' Expert on Insurance Claims Handling**

At trial, the City of Hobbs called Keith Charleston as an opinion witness. The district court permitted *voir dire* by Nutmeg's counsel and sustained an objection by Nutmeg to the

offer of proof of Charleston's proposed testimony. III App. at 694. The district court held that Mr. Charleston did not satisfy Rule 702 of the Federal Rules of Evidence,[5] finding that he lacked specialized knowledge about handling of bad faith cases in New Mexico involving third party insurance disputes.

We review the exclusion of an expert witness' testimony, which is challenged here, for an abuse of discretion. Compton v. Subaru of America, Inc., 82 F.3d 1513, 1517-18 (10th Cir. 1996). There are two requirements that a party seeking to offer expert testimony must satisfy before the trial judge may permit the witness to testify. First, the witness must be expert. In re Paoli R.R. Yard PCB Litigation, 35 F.3d 717, 741 (3d Cir. 1994), cert. denied, 513 U.S. 1190 (1995). "The fields of knowledge which may be drawn upon are not limited merely to the scientific and technical but extend to all specialized knowledge." Fed. R. Evid. 702 advisory comm. note (1972). The district court appeared to accept Mr. Charleston as an expert in some respects. III App. at 694. Mr. Charleston has approximately 30 years of experience in claims adjustment and claims handling. Id. at 674, 685-87.

Second, the expert's testimony must assist the trier of fact. The trial judge here found

_____

[5]Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

-24-

that Mr. Charleston's opinion would not be helpful to the jury because: (1) the jury was capable of determining the bad faith issue on its own, E.G. Thompson, 34 F.3d at 941; and (2) Mr. Charleston lacked specialized knowledge on New Mexico bad faith cases and his experience was with first party, not third party insurance disputes. III App. at 694.

We feel that the judge did not abuse his discretion by refusing to admit Mr. Charleston's proffered testimony on this record. Though a proffered expert possesses knowledge as to a general field, the expert who lacks specific knowledge does not necessarily assist the jury. Broadcort Capital Corp. v. Summa Medical Corp., 972 F.2d 1183, 1195 (10th Cir. 1990); but see Compton v. Subaru of America, Inc., 82 F.3d at 1519-20 (district court did not abuse its discretion in admitting expert witness' testimony though witness possessed general knowledge). Mr. Charleston did not demonstrate knowledge specific to New Mexico and the handling of third party claims. Therefore, the judge did not abuse its discretion in relying upon these factors to exclude the testimony. See Broadcort Capital, 972 F.2d at 1195.

We are remanding the case for further proceedings. Of course, expert testimony along the line that the City proffered below may be produced again with different supporting qualifications. That offer of proof should be assessed in light of qualifications then shown and the requirements of Rule 702 and it might then be found proper for admission. We only hold here that the specific ruling on this record, challenged on this appeal, was not an abuse of discretion.

## Conclusion

Accordingly, we **REVERSE** the district court's judgment for the defendants based on the grant of Nutmeg's motion for judgment as a matter of law and **REMAND** the case for further proceedings consistent with this opinion.